225 F.2d 146
 Oleta O'Connor YATES, Henry Steinberg, Loretta Starvas
Stack, Frank Efroim Spector, William Schneiderman, AL
Richmond, Albert Jason Lima, Carl Rude Lambert, Rose Chernin
Kusnitz, Ernest Otto Fox, Ben Dobbs, Dorothy Healey
Connelly, Philip Marshall Connelly and Frank Carlson, Appellants,
v.
UNITED STATES of America, Appellee.
 No. 13480.
 United States Court of Appeals, Ninth Circuit.
 March 17, 1955.
Rehearing Denied June 15, 1955.
Certiorari Granted Oct. 17, 1955.
see 76 S.Ct. 104.
 
 Margolis, McTernan & Branton, Leo Branton, Jr., Los Angeles, Cal., for appellants Dobbs, Lambert and Steinberg.
 Dreyfus, McTernan & Lubliner, Benjamin Dreyfus, San Francisco, Cal., for appellant William Schneiderman.
 Gladstein, Andersen & Leonard, Norman Leonard, San Francisco, Cal., for appellants, Carlson, Fox and Stack.
 Margolis, McTernan & Branton, Ben Margolis, Los Angeles, Cal., for appellants Lima and Yates.
 Alexander H. Schullman, Los Angeles, Cal., for appellants Dorothy Healy Connelly and Philip Marshall Connelly.
 A. L. Wirin, Los Angeles, Cal., for appellants Kusnitz, Richmond and Spector.
 Laughlin E. Waters, U.S. Atty., Ray H. Kinnison, Asst. U.S. Atty., Chief, Criminal Division, Norman W. Neukom, Asst. U.S. Atty., Chief Trial Asst., Los Angeles, Cal., Rex A. McKittrick & Lawrence K. Bailey, Sp. Assts. to Atty. Gen., for appellee United States.
 Before STEPHENS, FEE and CHAMBERS, Circuit Judges.
 JAMES ALGER FEE, Circuit Judge.
 
 
 1
 Defendants in this criminal case were convicted by a jury upon an indictment which charged them as participants in a conspiracy to commit crimes with the specific intent of causing the overthrow of the Government of the United States by force and violence as speedily as circumstances would permit. The trial lasted over a period of some six months, and the jury, before returning its verdicts, took six full days for deliberation. Each defendant has appealed from the judgment of conviction entered pursuant to the finding of the jury. Every phase of the indictment, the trial, the instructions and the theory of the Court has been raised by motion, objection, exception and assignment of error.[1]
 
 
 2
 The impressive feature of this case is that practically every assignment of error urged in this appeal has been ruled upon by the Supreme Court of the United States in Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 864, 95 L.Ed. 1137.[2] There the basic statute in the original form was held 'inherently' constitutional and also as applied to a situation involving a similar conspiracy connected with the unlawful concert found to exist in the case at bar. In the main and concurring opinions, principles were laid down which are virtually conclusive here. The defendants, notwithstanding this positive holding, paradoxically complain that the trial court here denied their motion to take testimony on written interrogatories with respect to the impact of the Smith Act and its enforcement on First Amendment rights, and rejected an offer of proof on the ground that the Dennis decision had foreclosed any further proof of unconstitutionality on the facts then before that court.
 
 
 3
 Defendants principally contend, as they must to prevail, that the trial court here departed in the course of the trial from the mandate so laid down by the Supreme Court. A careful analysis must be made of the opinions of the highest court, the statute as then written and the indictment in that case in order to appraise the claims of error in the instant appeal.
 
 
 4
 The indictment in the Dennis case was drawn in accordance with the basic statute, which appeared as Sections 10 and 11 of Title 18 U.S.C. (1946 Ed.). Section 10, as originally enacted and as it was in force at that time, read as follows:
 
 
 5
 '(a) It shall be unlawful for any person--
 
 
 6
 '(1) to knowingly or willfully advocate, abet, advise, or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force o violence, or by the assassination of any officer of any such government;
 
 
 7
 '(2) with the intent to cause the overthrow or destruction of any government in the United States, to print, publish, edit, issue, circulate, sell, distribute, or publicly display any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence;
 
 
 8
 '(3) to organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any government in the United States by force or violence; or to be or become a member of, or affiliate with, any such society, group, or assembly of persons, knowing the purposes thereof.'
 
 Original Section 11 read as follows:
 
 9
 'It shall be unlawful for any person to attempt to commit, or to conspire to commit, any of the acts prohibited by the provisions of sections 9-13 of this title.'
 
 
 10
 In the light of this statute, the Supreme Court wrote the principles which defendants say the trial court here refused to follow in several essentials. First, it is contended that basic liberties guaranteed by the First Amendment and other constitutional provision were submerged by an expanding wave of restraint brought about by an improper application of the Smith Act. Second, they say the highest court required a finding of a clear and present danger from the conspiracy, and none was made at this trial. Third, defendants claim the approval of the Supreme Court of certain other striking phrases given currency in the trial of the Dennis case constituted positive fiat that these be used in all future cases.
 
 
 11
 First, the Supreme Court ruled definitely that constitutionally guaranteed rights, including freedom of speech, of publication and of assembly, were not violated by indictment and conviction under the Smith Act in the form above quoted. The courts were dealing there with substantive law as set out in that statute, which related to organization for the purpose of teaching and advocating overthrow. Section 11 of the Act as it then read, by use of the words 'to conspire to commit,' denounced as principals all who engaged in the attempt or in joint action to bring about the acts specified as criminal. Mere membership or officership in the Communist Party, insofar as that organization was shown by the evidence to teach the proscribed doctrine, might have been taken as proof against the individual defendant of joint action with others to bring about the end intended.
 
 
 12
 However, in face of the challenge of the dissents there, the Supreme Court held the nature of the joint activities of those involved was such as to bring about a 'clear and present danger' and that, collectively, the conspirators had 'power to bring about the evil.' The latter phrase apparently meant that the setting in which the defendants there acted was such as to allow the court to conclude that the teachings might have resulted in an attempt at overthrow. It is true that, in accomplishing the result, the courts treated the Smith Act as though the substantive crime of conspiracy were charged. Moreover, the appellate courts approved the importation into the statute of a specific intent and object which was not expressly authorized by the wording of the particular section and which was not incorporated in the formal charge. As we shall see hereafter, the current indictment gave scope for these judicial additions.
 
 
 13
 Specifically in the second place, it is said the trial judge here violated principles there enunciated by failing to find a 'clear and present danger' to the government by whatever the proof showed was said and done by defendants. In the Dennis case, with a factual situation typical of the case at bar, the highest court approved a statement as a matter of law by the trial judge that a clear and present danger there existed in virtue of acts and intent of the defendants in that group. If that were a true rule of law for the Dennis case, it is the rule of law here. For world conditions at the date of that trial had not changed for the better when trial in the instant case was had. It must be remembered that the eleven convicted defendants in that case were named in this indictment as co-conspirators although not made defendants. Much of the literature and writings introduced were identical, as was the general type of proof, although we attempt no comparison of the respective records. While an independent conspiracy was charged here, the design was as closely connected as to the previous combination as a spoke to the wheel.[3] There organization was charged nationally, and here there was special emphasis on organization in California. The essential pattern was similar. Since this may not be the exact point of the contention, the matter will be considered in other connections later.
 
 
 14
 Finally, the opinion of the Court of Appeals and a concurring opinion in the Supreme Court gave approval of instructions of the trial judge in Dennis requiring the jury to find 'language of incitement' was used by the conspirators there. Another phrase given approval is that the doctrine of destruction had become a 'rule of action.' In conjunction with an indictment based upon such a statute proscribing organization for the purpose of teaching and advocating overthrow, but which required neither proof of overt acts nor a specifically planned objective, such precautionary instructions were well enough. But these expressions of the judges in instructions in connection with the original statute established no unalterable requirement that such phrases themselves be used ipsissimis verbis where the changes in the basic law and an entirely different indictment predicated upon the conspiracy statute have rendered admonitions to a jury in such language supererogatory. Such claims have been answered in the main opinion in Dennis:
 
 
 15
 'Speech is not an absolute, above and beyond control by the legislature when its judgment, subject to review here, is that certain kinds of speech are so undesirable as to warrant criminal sanction. Nothing is more certain in modern society than the principle that there are no absolutes, that a name, a phrase, a standard has meaning only when associated with the considerations which gave birth to the nomenclature. * * * To those who would paralyze our Government in the face of impending threat by encasing it in a semantic straitjacket we must reply that all concepts are relative.'
 
 
 16
 Defendants themselves say that there were significant legal and factual differences between the situation in the Dennis case and the case at bar. We agree. The situation has been changed by far-reaching legislation and rulings in further and complete protection of the rights of these defendants. As a result, there are vital distinctions between this case and those which have been previously ruled upon.
 
 
 17
 The question is whether the trial court here followed the applicable concepts of Dennis in a changed situation. The Attacks upon the manner in which the case at bar was tried and the incidents are now for consideration.
 
 
 18
 The indictment[4] charged the defendants themselves and certain persons convicted in the Dennis case with conspiring, 18 U.S.C.A. § 371, to commit offenses against the United States prohibited by the Smith Act as amended, 54 Stat. 670 (1940); 18 U.S.C. (1946 Ed.) § 10, (1948 Ed.) § 2385,[5] 'by (1) willfully and knowingly advocating and teaching the duty and necessity of overthrowing the Government of the United States by force and violence with the intent of causing the aforesaid overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit and by (2) willfully and knowingly organizing and helping to organize as the Communist Party of the United States of America a society, group and assembly of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence with the intent of causing the aforesaid overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit.'
 
 
 19
 The means were elaborated by charging, as a part of the conspiracy, the matters epitomized as follows: (2) 'conspirators would become members, officers or functionaries in the Communist Party' 'and in such capacities would assume leadership' 'and responsibility for carrying out its policies and activities'; (3) would cause to be organized units of the party in New York and California and would recruit members; (4) would publicize and circulate publications advocating overthrow; (5) would write articles and directives for printing in publications of the Communist Party; (6) would conduct schools and classes in which recruits and members would be indoctrinated; (7) would agree upon and carry into effect plans for vital parts of the Communist Party to go underground and there continue the conspiracy; (8) would use false names and documents to conceal their identities and activities as members and functionaries, and (9) would conceal the existence and operations of the conspiracy.
 
 
 20
 A series of overt acts were alleged to have been done by one or more defendants 'in furtherance of the objective of the conspiracy.'
 
 
 21
 The first of the differences between this and the Dennis case is that the present indictment charges the inception of this crime as a continuing conspiracy on June 28, 1940, and in full effect until the date of finding of the indictment, which was December 21, 1951. This, of course, constitutes no ground for objection to the indictment. The mere fact that the indictment for the coordinate activities in the Dennis case was less broad in scope is of no avail to defendants here. Certain phases of the claim of variance will be dealt with later.
 
 
 22
 Second, it is contended that a change was caused by legislation for the protection of defendants. A new Act provided that officership or membership in the Communist Party should not constitute 'per se' a violation of that Act, requiring registration by such members, or 'of any other criminal statute.'[6] Likewise, it was provided therein that registration by a Communist member or officer under that Act should not be used as evidence against him in any criminal proceeding. Apparently, this made a change in the law previously, as teachers and club chairmen were held to be in the position of co-conspirators in the Dennis case. 183 F.2d 201, 230, 231. At this point, concern is had only with the effect of the section just referred to upon the indictment. The divergence from the form of indictment used in the Dennis case required peculiar phrasing emphasizing the individual nature of the charge. The instrument here highlights the fact that, among the means agreed upon, the individual defendants were to obtain membership and offices and assume leadership in order to bring about the objective charged. The Communist Party of the United States was not indicted. No defendant was indicted for organizing the Communist Party of the United States. None was charged with guilt because of membership or holding office in that party. But each was fairly charged with joining in concert of action to organize a society 'as the Communist Party' and to use leadership therein with the intent to accomplish overthrow.
 
 
 23
 The third change was far-reaching. Since the Supreme Court had upheld a conviction for joint action under substantive provisions of the Smith Act as then written, it was a great protection that Congress, by the change in the wording of the law, left the way open to discard the vague 'conspiracy' clause of the original statute, and to use instead the standardized body of law with which the profession was familiar by framing the indictment under the specific enactment proscribing conspiracy as a substantive offense.
 
 
 24
 This section, which was first placed upon the books in the year 1867, is now codified with some changes as 18 U.S.C.A. § 371, which reads in part as follows:
 
 
 25
 'If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.'
 
 
 26
 The literature of the law relating to the substantive crime of conspiracy is voluminous and covers every phase of indictment, trial and judgment.[7] The use of the statute in this case was of great advantage to defendants as well as the government, since the precedents made the issues crystal clear[8] and enabled the trial judge to rule with justice. Specifically, this charge of the substantive crime of conspiracy placed the government under heavy burden as to proof, which will be explained hereafter. In the Dennis case, the courts treated the original Smith Act quoted above as containing a charge of conspiracy and applied the law without any of the limitations set up by the precedents which have been developed under Section 371. It cannot therefore be charged by any except a lawyer impelled by zeal for a client that the instant case is one 'where prosecution for the substantive offense is adequate and the purpose served by adding the conspiracy charge seems chiefly to get procedural advantages to ease the way to conviction.' But the objection is, of course, urged here by lawyers for the defendants. The concurring opinion of Mr. Justice Jackson in the Dennis case, which treated the indictment there as if it contained a charge of conspiracy as a substantive crime, was, of course, unsound as related to that case. The doctrine was treated as applicable in that opinion although the limitations contained in the statute are not mentioned. Although it is clear that, in the opinion of the other justices, a true conspiracy charge was not involved, the convictions were upheld in the face of the exposition of the place in our political structure which is maintained by personalized individual freedom of speech, publication and assembly.
 
 
 27
 An indictment which, as the one at bar, charges an agreement by two or more persons willfully and knowingly to organize a group, society or assembly of persons and thereby develop and use an apparatus designed and dedicated to advocate and teach overthrow and destruction of the government by force and violence when each person entering the concert of action is charged with entertaining the specific objective and intent of causing such overthrow pleads a 'standard' conspiracy.
 
 
 28
 Where an unlawful agreement is set up, even though the means intended to be used were entirely legal, if the ultimate objective be criminal, a conspiracy is alleged. Under this indictment, if it be assumed that advocacy and teaching are immunized by the constitutional guaranties, still, even though these means were lawful and protected, since the advocacy was intended to cause the destruction and overthrow of the government by force, a criminal conspiracy was defined.
 
 
 29
 An overwhelming advantage to each defendant by indictment under 18 U.S.C.A. § 371, was the provision thereof which required an 'overt act' to be proved as well as a 'conspiracy' before conviction could be had under this phase of the Smith Act itself. This was a far-reaching change from the situation in the Dennis case for persons accused. By the statement of things actually done by a particular person or persons, the matter was not left to conjecture as to the nebulous design based upon utterances and publications alone, but specific occurrences were to be set up whereby the supposed conspirators in unlawful agreement effected a debouchment into the filed of positive action. Defendants make an elaborate theoretical argument that the 'act of conspiring' or 'compassing by bare words or saying' or 'the imagination of the mind to do wrong' is not sufficient 'without an overt act.' However effective this thesis might have been in the Dennis case, it is frustrated and rendered nought by the form of the indictment. Congress had already answered the theoretical thesis by the amendment above noted, which emphasizes the deep gulf between the situation here and that in the Dennis case. But the pleader here included the overt acts charged as carrying out the 'standard' conspiracy of Section 371. Twenty-one allegations of overt acts were made, which is sufficient. The suggestion that the acts alleged were in themselves innocuous is not valid. The law relating to this crime does not require more than the allegation contained in the indictment that these were done in pursuance of the unlawful agreement and to effect the purpose thereof.
 
 
 30
 The principles of freedom applied to speech, publication and assembly must be preserved. Under the instant indictment, there are implications which must be considered, but the impact is much less direct than in the Dennis case. As heretofore indicated, the charge here is of a substantive conspiracy to act with a definite objective where one overt act must be alleged. The teaching and advocacy of the duty and necessity of destruction of the government by force and violence, although criminal by substantive enactment, are here by the language of the charge made subservient to the alleged purpose and object of organizing to advocate and teach with intent to destroy and overthrow as speedily as circumstances permit. The indictment in the Dennis case was entirely different.
 
 
 31
 Finally, a vital metamorphosis was brought about by attacks of defendants themselves upon the two original indictments. The trial judge held that such indictments did not sufficiently state the ultimate object of the conspiracy and the individual intent of each conspirator to bring the postulated action to fruition. In redrafting, the pleader amalgamated the two indictments and added the words which had been approved by the Supreme Court as sufficient to set forth a criminal state of mind in Dennis. The defendants were advised beforehand that the government was to establish as a prerequisite of conviction that each one had as an object 'the overthrow or destruction of the Government of the United States by force and violence as speedily as circumstances would permit.' (341 U.S. 494, 71 S.Ct. 868.) As noted above, it is hornbook law that a conspiracy is an agreement by two or more persons to accomplish a lawful objective by unlawful means or, on the other hand, by lawful means an illegal objective.[9] By making this one of the essentials of proof beyond a reasonable doubt by the government as to each individual before he could be designated as a co-conspirator, by the process of stating in the indictment the objects of the alleged 'standard' conspiracy, a chemical change was wrought therein.
 
 
 32
 Defendants made a motion to dismiss the present indictment. It is implicit in the contention thereon that they assert the phrases heretofore referred to must have been included and that it must be charged formally that the activities of defendants created a 'clear and present danger,' that each defendant had 'power to bring about the evil,' that defendants conspired and agreed to use the 'language of incitement' in teaching and advocacy, and that defendants conspired and agreed to make the duty and necessity of overthrow a 'rule of action.' Defendants were hampered in making such argument explicit because neither the indictment in the Dennis case nor that in the Flynn contained any such allegations.
 
 
 33
 The trial court correctly held that the indictment charging a standard conspiracy to commit offenses against the United States in violation of the amended Smith Act, by teaching, advocating and organizing, alleging specific overt acts and defining precisely a proscribed intent, was sufficient.
 
 
 34
 Finally, in its present form, the indictment by its inherent terms charged not only that the language of incitement was used, but it was used in order that the proscribed doctrine should become a rule of action. It is the very gist and gravamen of the present charge that action was agreed upon in organizing local groups and societies in California and in infiltrating labor unions and other organizations. It was alleged that overt acts were committed. In ordinary crimes, this is sufficient. If conspirators to commit a crime of violence are charged with the use of speech or of writings or of meetings in order to obtain confederates, nothing further would be required than here contained.
 
 
 35
 This leads to another contention of defendants, which is laid at rest by the language of the charging instrument. It is contended that the trial court incorrectly defined the word 'organize' used therein. But the indictment itself charges that the conspiracy was to organize a society, group and assembly of persons who advocate and teach the duty and necessity of overthrow 'as the Communist Party.' It is alleged that the conspiracy continued until the date of the finding of the indictment. But the basic charge was expanded by the specific clause. 'Organize' is defined by exact phraseology in Section (3) of the indictment as follows:
 
 
 36
 'It was further part of said conspiracy that said defendants and co-conspirators would cause to be organized Groups, Clubs, Sections, District and State Units of said Party in the State of California and elsewhere and would recruit and encourage recruitment of members of said Party concentrating on recruiting persons employed in key bases, industries and plants.'
 
 
 37
 Even if the Communist Party of the United States were given a constitution and by-laws in 1945, as defendants contend, by the help of the co-conspirators and had certain officers, this does not mark the date when this combination completed organization of a group, society or assembly of people who advocate and teach destruction 'as the Communist Party of the United States.'
 
 
 38
 The dictionary definition of organization indicates that 'to organize an army' is a phrase which clarifies the meaning of the verb. If one started out to organize the 25th Army with nothing more than the order creating the entity, organization would not be complete simply because the headquarters had been put together and the general officers and staff officers selected. The bare cadres of the regiment would not be sufficient. Recruitment, formation of units, completing officer personnel, regrouping of personnel in different units and expansion of various units to the prescribed or desired strength would be necessary. We may well agree that, once the 25th Army has been completely created to authorized strength and officered, thereafter recruiting for replacement or change of one regiment for another would not fall within the designation. The charge that there was a conspiracy to organize the 25th Revolutionary Army, there being no such organization at the time, might, of course, show that the concert of action for that purpose lasted for years.
 
 
 39
 This consideration brings up logically the next contention of the defendants that the Statute of Limitations barred prosecution in this case. The indictment itself destroys this argument. As noted before, it charges a continuing conspiracy from June 28, 1940, to the date of finding the indictment. The contention is that the Communist Party of the United States was completely organized in 1945, and that therefore the statute ran against this portion of the charge. It has already been noted there is no charge of conspiracy to organize the Communist Party of the United States as such. The activities of organization are particularly defined in the indictment. There is no doubt that certain of these activities occurred within three years of the filing of the formal charge.
 
 
 40
 The accusation is of a continuing conspiracy. Even if the above considerations were unsound, still the indictment would be valid and timely because it is alleged that the conspiracy continued until the date of the finding in the indictment. If, in a conspiracy of a nonpolitical nature, it were alleged that the defendant combined and agreed to commit two offenses or crimes with the design to bring about an ultimate objective as soon as circumstances would permit and committed overt acts pursuant to the conspiracy within the three year period, the indictment would be sufficient. Even if it were established by judicial knowledge or otherwise that one of the substantive crimes charged as the objective of the continuing conspiracy had been fully consummate and complete, so that the statute of limitations had run against prosecution of the substantive offense, still an indictment would lie for a conspiracy, the grand objective of which had not yet been attained. Here, where the charge is that each defendant acted with intent to bring about the overthrow and destruction of the Government of the United States, it cannot be assumed from reading the indictment that the defendants abandoned the conspiracy until the event which they intended had been consummated. Only one conspiracy is charged, to commit several offenses against the United States. Therefore, the mere fact, assuming it to have been proved, that the crime of organizing had been complete, the conspiracy would still have continued in order to teach and to advocate destruction.
 
 
 41
 In this place, because it is a logical development, the question of the scope of the conspiracy in time and the supposed variance will be considered, although phases of proof and instructions enter therein. One of the most distorted concepts of the defendants is that, if an agent or attorney employed by the United States has taken a position in some criminal prosecution that the Communist Party was completely organized in 1945 or that a court has accepted such a position for the purposes of the case before them, the United States is thereby estopped in this case from taking any contrary position. This concept is not founded upon any familiar doctrine of double jeopardy, res adjudicata or estoppel by judgment. Defendants make the claim for all parties and each defendant, whether or not he may have had connection with the previous litigation.
 
 
 42
 These contentions will be squarely met. None of these claims is valid. These Defendants, who were not parties to the Dennis case or the Flynn case[10] can hardly have been prejudiced if the United States Attorney in Los Angeles charged a conspiracy separate from the ones in those cases, as initiated in 1940 and continuing until 1950. The principles laid down by the Supreme Court in the Dennis case are applicable, but no one has contended that the facts of the two cases were exactly the same. The mere fact that there was a connection between the defendants and the parties charged in the Dennis case and that the over-all criminal design was the same is of no relevance. The government was not estopped from alleging and proving that these defendants conspired to help organize a society, group or assembly 'as' a part of the Communist Party in the State of California.
 
 
 43
 The fact that another contention was made in another record or was stated by some court in dealing with other contentions is not binding here. The fact, if it be a fact, that there were constitution and by-laws adopted in 1945 would not mean that the party was organized except in the loose sense. But the organization of a group, society and assembly would not be completed by that formal constitution. There would still have to be members, and it was specifically charged that, to complete the membership in California, it was the design to add new groups and recruit new members. Of this defendants were on notice. They could not be heard to complain that in some other case the agents of the government proved something different. The defense offered no proof of a contrary state of facts than that shown here. Furthermore, there was not introduced in evidence any record in which the facts here claimed to have been adjudicated were established.
 
 
 44
 By the same process, the remainder of the defendants attempt to take advantage of the favorable opinion of the Supreme Court of the United States in the case entitled Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796. Here again, no record was proven. The defendants here were not parties to the prior civil case. They could take no advantage of it, whatever the holding.
 
 
 45
 Furthermore, even as to Schneiderman himself, the denaturalization case was not res adjudicata. The record was not introduced[11] as to him either. The true state of the matter was that the trial court there made findings of fact that Schneiderman was not attached to the principles of the Constitution of the United States because he was an officer in the Communist Party at the date of his admission, and cancelled his citizenship. The Supreme Court of the United States had no power to make findings on appeal, but dismissed the case, apparently on the ground that Schneiderman was not shown personally to have interpreted the Communist literature as advocating overthrow and that therefore the findings were clearly erroneous. Other opinions there seemed to go on the ground that, at the naturalization hearing, the court had found that Schneiderman was attached to the principles of the Constitution. In any event, whatever the holding, it can do Schneiderman no good here. No precedent has been cited nor are there any which establish the doctrine that a prior judgment in a cancellation of citizenship case estops the government or that the findings therein are res adjudicata against the government in a subsequent criminal case. The analogies are all to the contrary. It is a bright idea, but no one seems to have thought of it before.
 
 
 46
 Attention is now directed to the claimed error in the admission of specific evidence. Apparently there is urged that no proof was admissible as to any overt act, because it is said none of those alleged could have been such as 'clearly and unequivocally to effect the specific object of the conspiracy.' The specific object, according to the indictment, was the teaching and the advocacy and organization for destruction and overthrow. Even belief may be removed from the circle of immunization, although this cannot be done 'in the absence of overt act indicating such was his interpretation.'
 
 
 47
 To take one example, the indictment charged, as mentioned above, one such act in the following language:
 
 
 48
 'On or about January 21, 1949, Henry Steinberg, a defendant herein, did attend and participate in a meeting.'
 
 
 49
 The proof showed that the meeting was called for several purposes, as outlined below. Steinberg made a number of speeches there, and stated that 'this was a Lenin Memorial meeting,' at which he presided. An announcement of the meeting in the People's World asked persons to attend and 'demonstrate for the Bill of Rights' as it would 'serve primarily as a protest against the current trial in New York of twelve national leaders of the party.' There was no question about the facts, which were uncontroverted, if the jury believed the testimony.
 
 
 50
 In the face of the objections that this was the act of a member and officer of the Communist Party and that it had no reasonable tendency to effect the proscribed objective, the evidence was clearly admissible to show the acts and intent of Steinberg personally of his participation. Without doubt, aside from this, the evidence was admissible on the allegation of the overt act. It was for the jury to determine, under proper instruction, whether the act was done with the intent and whether it tended to effect the object. Other allegations of over acts made admissible proof thereof. No detailed discussion will be accorded them therefore. In each instance, the evidence admitted could have been justified upon the ground that it was in any event relevant as to the intent or participation of a particular defendant.
 
 
 51
 The defendants object strenuously to the receiving in evidence of various classes of reported words of the defendants and other persons. This question has been raised in each of the cases which have arisen under the terms of this Act, and it has been uniformly held that the usual rules of the criminal law in relation to conspiracy prevail. The chief complaint as to the utterances of the defendants themselves is that they are not sufficient to establish conspiracy or intent. But the expressions of a defendant in a criminal case are admissible against him either as admissions against interest or as voluntary acts which it is testified he has done. These utterances of a particular defendant were not protected from admission into evidence by the guaranties of freedom of speech. They could be related to a jury for the purpose of allowing the jury to determine whether the party were acting with an innocent or guilty intent as required. In criminal cases, the utterances of a defendant reported in court by other witnesses have always been received to determine intent. The declarations and acts of each defendant on his own account are particularly important since his individual participation and intent must be shown independently of and without relation to declarations or acts of others.
 
 
 52
 Before the acts and declarations of third persons become binding upon an individual under the law of conspiracy, there must be shown to be (1) an illegal agreement to commit crime by two or more persons, (2) that the particular defendant was a knowing and willful participant, and (3) that the act or declaration by third party conspirator was in pursuance to and in order to bring about the criminal objective. Proof of close association and concert of action over a period of years among those charged as co-conspirators might have established prima facie the unlawful agreement. If the other conditions were met, declarations and acts of third parties would be admissible against a particular defendant. In this connection, the proof of the association was not inadmissible by the particular defendant's membership or holding office in the Communist Party, for the indictment charges that the organization of a society or group was one of the objects, and even defendants do not claim organization of the party until 1945. But it is claimed that the third party declarant cannot be shown to be a co-conspirator by his own admission of membership in the party. This is correct. But proof of association in the activities, coupled with such a declaration, might be sufficient. No instance was not shown.
 
 
 53
 A great deal of evidence to prove 'the nature and character and aims and objectives of the Communist Party' was objected to, and admission is assigned as error. It is, of course, agreed that the party was not indicted. But defendants were charged with conspiracy to organize a society or group to advocate and teach. Everything which was advocated and taught at meetings of the group or society would be relevant to determine what the purpose of the organization was. If it was found that the society or group was in the process of organization as the Communist Party, the teaching and advocacy under its auspices would be pertinent, whether or not defendants were present. It is true, an expression or utterance at such meeting would not be binding upon the Communist Party and, unless made by a co-conspirator, would not be binding upon a particular defendant, but it would be admissible. However, what was taught and advocated at schools and meetings of the Communist Party after the date of the formation of the conspiracy would be admissible in order to prove how much, if any, success the conspirators had in carrying out their illegal plan to organize groups, societies or assemblies and obtain recruits and to teach and advocate destruction. This became particularly pertinent in determining whether the conspiracy was still continuing during the three-year period prior to indictment and in determining with what intent any defendant did one of the alleged overt acts within that period.
 
 
 54
 There was no statute such as the Smith Act before the passage of that enactment in its original form on June 28, 1940. It is contended that no evidence of the aims and objectives of the Communist Party then in existence (and which defendants claimed was later dissolved) by expressions at its meetings or the teaching in its schools was entitled to admission. But it must be remembered that some defendants were shown to have been closely associated with that organization and with each other, and they claim that its teachings were innocuous. The government was not selective, but introduced the literature and the expressions. These were pertinent if only to show there were other possible interpretations of the doctrine besides the version to which defendant Yates testified. Defendants had full opportunity to rebut these interpretations. It cannot be said these were inadmissible. The trial court might possibly have excluded such testimony on the ground of considerations of remoteness or administrative convenience. It was unquestionably relevant and therefore it was not error or abuse of discretion to admit the evidence.
 
 
 55
 After the introduction of the evidence by the government, which ran over nine thousand pages besides the voluminous exhibits, all defendants rested except Schneiderman, Yates, Stack and Carlson. The evidence of the defense consisted of two witnesses who testified shortly, the reading of a deposition and the testimony of defendant Yates. The latter consisted almost exclusively in an exposition of her 'understanding' of the Communist Party teaching and advocacy on achieving the socialist revolution. Although the evidence intrinsically must be sufficient to convict beyond a reasonable doubt as to each defendant, it must be borne in mind that the jury weighed evidence which was a in essentials uncontradicted.
 
 
 56
 Many of the arguments, and indeed most of them, are reiterated in relation to the instructions given and refused. The trial court gave instructions on the subject of conspiracy to commit offenses against the United States, which are couched in precise and accurate language and which correctly reflect concepts approved by the Supreme Court and other federal courts over the period of approximately eighty years during which this law has been upon the statute books. Appropriate cautions were given to protect fully the rights of defendants.
 
 
 57
 It was said that the conspiracy must be found to have existed as charged before the allegations of overt acts could be considered. The defendants contend that the overt acts charged in the indictment consisted of the exercise of either freedom of utterance, freedom of publication, or the free use of the right peaceably to assemble, and that therefore such acts, having been immunized by the Constitution, could not be used as indicia of crime. But it is well settled in ordinary conspiracy cases that the overt act proven need not have inherent criminal attributes or connotations, if it carries the illegal design into the field of action. For, if criminal purposes can be shielded from prosecution by the use of speech, there will be no more convictions of those clever enough to use this medium.
 
 
 58
 It is true such an act in itself could be innocent. In order to consummate the conspiracy, as the court said, 'It must, however, be an act which follows and tends to accomplish the plan or agreement, and must be knowingly done in furtherance of an object or purpose of the conspiracy charged in the indictment.'
 
 
 59
 The trial court carefully limited the effect of testimony as to membership and officership in the Communist Party. Cautions against use of 'similarity of conduct' or 'association' or discussion of common 'aims and interests' as absolute tests were given. The court instructed:
 
 
 60
 'It has been said that 'a conspiracy is a partnership in criminal purposes'. The gist of the offense is a combination or agreement to violate the law.'
 
 
 61
 and that, if all elements of conspiracy were established,
 
 
 62
 'then the success or failure of the conspiracy to accomplish the common purpose or design is immaterial.'
 
 
 63
 The requested instructions of the defendants, which the court refused, constitute a series of strange and distorted propositions as to the law of conspiracy. Defendants contend that it was error to refuse a requested instruction that 'the burden of proof cannot be met by showing that a particular interpretation of Marxist-Leninist theory is the most correct or the most probable interpretation with an inference therefrom that the Communist Party accept such interpretation' embodies all these errors. The conspirators were not indicted for teaching Marxist-Leninist philosophy or that of Stalin or Malenkov, but for conspiracy sparked by an intent to destroy.
 
 
 64
 The indictment did not charge that this literature on its face bore a sinister meaning, nor even that the individual defendants gave it a sinister meaning. Interpretations of the teachings of the Communist Party have no relevance because that entity was not on trial, nor were the doctrines which may have been taught or advocated by it. Defendants individually must have been found to have had the intent of immediate destruction. Each must have been found to have become a member of a combination so to teach and advocate and to organize persons who so teach and advocate with this object in view. Thus the interpretation of the literature, the written objectives and the constitution of the Communist Party of the United States, and the writings and speeches of the members and officials were irrelevant except as these tended to prove or disprove the individual guilt of the particular defendant of the crime charged in the indictment. Some instructions requested would give complete immunization to any speech, no matter if specifically uttered with the intent charged in this indictment. Any such formalistic test as this would, of course, give free rein to any subversive group because all they would have to do is to assemble to speak and to print words and distribute them. If then there could be argued that the meaning might be innocent on its face, the jury could not convict, according to appellants, even if it were one of the methods used to bring a conspiracy into the field of action.
 
 
 65
 Defendants apparently now contend the trial court should have told the jury that he found as a matter of law that the facts proved indicated 'a clear and present danger.' At least, they give lip-service to that contention. In our opinion, such an instruction could be justified only as a comment on the evidence. The instructions of the trial court clearly show that, if the jury convicted under the rules of law there laid down, they would have necessarily found a clear and present danger existed. If the trial judge had offered to instruct the jury as a matter of law on this subject, it seems that an exception[12] might have been taken on the ground of overemphasis. The state of the evidence might justify it as it did in the Dennis case. Defendants can not rely upon the failure to make the comment by the trial court (a) because the exercise, whether justified or not, would be highly unfavorable to them, (b) because no litigant is entitled to a comment of fact by the judge, and (c) because the normal place for the trial judge to rule upon the question of law as to sufficiency of the evidence, including presence of clear and present danger would be upon a motion for acquittal.
 
 
 66
 Closely connected with this is the objection that the District Court made no ruling upon the power of each of the defendants 'to bring about the evil.' But the Supreme Court did not require any such proof as to each defendant in the Dennis case. It is obvious enough that, if it had, there could have been no conviction. To require the court to instruct that the co-conspirators as a whole or that each defendant had the power to bring about the destruction of the government would be fantastic. If true, the revolution would have been consummated before trial. To require such a finding by a jury would be to ask them to take counsel of fear. In reliance upon the national aims and aspirations and the just consent of the governed, there are no such fears. On the other hand, if the trial court had thought these actions and utterances were merely vaporings of ineffective folk, upon motions for acquittal, a verdict of acquittal could have been directed.
 
 
 67
 Again, defendants made a point about the 'language of incitement.' They said the co-conspirators must have agreed not only to teach and advocate the violent overthrow as a duty and necessity with intent to bring it about as speedily as circumstances would permit, but that the trial judge must have told the jury that, if it were found that they had agreed not to use the language of incitement in teaching and advocacy thereof, no crime would have been committed.
 
 
 68
 The gist of the substantive crime of conspiracy is that an unlawful combination and agreement becomes a positive crime only when some of the proved conspirators enter the field of action pursuant to the criminal design. Therefore, if the conspiracy did not become a rule of action pursuant to the proscribed intent, there would have been no violation of the conspiracy statute. The use of such phrases in instructions might have been well enough where a violation of the Smith Act alone was charged in its original form. It would be folly to command imperatively that these specific phrases be each used in instructions after a trial on an indictment such as the present one.
 
 
 69
 In ruling upon the motions for acquittal, the trial court[13] decided as a matter of law that there was sufficient evidence to prove guilt of each defendant. In this ruling the trial court placed itself firmly as to each defendant upon the indictment which charged a conspiracy. The Supreme Court, in its main opinion in the Dennis case, said, 'The formation by petitioners of such a highly organized conspiracy * * * subject to call when the leaders, these petitioners, felt that the time had come for action, coupled with the inflammable nature of world conditions * * * convince us that their convictions were justified.' There was sufficient evidence to show that such a conspiracy existed, particularized as to the California area, and that it was implemented by continuous organization and use of groups and societies for teaching and advocating with the proscribed intent, the determination of the trial court must be upheld. The arguments urging upon us that the trial court held that 'advocacy plus intent' was sufficient to found a conviction has no basis. The trial judge did not rule that clear and present danger could be found to exist simply upon the basis of the possession of the proscribed intent. The trial judge 'equated' 'incitement' neither with 'clear and present danger' nor 'incitement' with the intent to bring about speedy overthrow. On the other hand, by applying the specific law of conspiracy, we are not convinced that the trial court found governmental powers by implication to be without inherent limits or exploited this law to engulf all powers which might possibly be exercised by an absolute sovereignty in the face of expressed prohibition. Indeed, the arguments presented by defendants and amicus curiae are paradoxical. Some of these declare with great insistence that there should not be one law for trial of Communists and another law for trial of persons charged with crime generally: a doctrine which requires no exposition in this Court. It is with utter inconsistency that they urge measures fantastic and bizarre which have never been applied in ordinary criminal cases. The most striking incongruities are found in these presentations. No further notice in detail will be taken thereof, but a short review of some of the matters considered by the trial court will prove the soundness of his rulings with regard to the evidence.
 
 
 70
 The most significant questions which are present in this record are those which relate to sufficiency of the evidence. The review by the Supreme Court of the Dennis case did not explicitly relate to the sufficiency of the evidence there. But the opinion of the Court of Appeals leaves no doubt that there was a sufficiency of evidence in that case. There is no attempt here to compare the content of the record in this case with that in the Dennis case or the Flynn case or any other case prosecuted under this statute.
 
 
 71
 There are only two questions in this regard for this Court. First, whether on each specific point essential for conviction there is sufficient evidence so that it can be said a jury could find the issue was established beyond a reasonable doubt and to a moral certainty. The jury, by the verdict, have already expressed their satisfaction with the proof. Second, whether, on the record as a whole, it affirmatively appears that the trial was fair and impartial and the verdict can be sustained.
 
 
 72
 Many of defendants sought and obtained office as 'organizers' in the party. The jury might well have inferred from this participation a carrying into the field of action a phase of an illegal agreement to organize a group, society or assembly and thereby to furnish the society with organs and to arrange and constitute into interdependent parts the Communist Party in California and to furnish recruits therefor. It must always be remembered that the jury were regularly instructed that membership or holding office in the party are not denounced as such. But this would not prevent them from concluding that acceptance of an office designated as 'organizer' with duties to assist in organization, evinced a participation in the unlawful agreement and, together with other circumstances as to a particular defendant, might prove it beyond a reasonable doubt.
 
 
 73
 The association of most of defendants among themselves and with other co-conspirators and with other persons whose advocacy of destruction is known was clearly proved. Their acts and conduct in close control of schools and classes where party members and putative recruits were taught the tenets of violent overthrow were clearly established. Indoctrination in techniques of action to induce revolution and of assaults upon citadels of bourgeois power was furthered and encouraged by these instruments. As to many of them, an individual finding that he was a well-trained professional revolutionist might well have been made. The concert of action of all could have been found by a jury beyond a reasonable doubt. The proscribed intent could also have been found as to any defendant. The jury were entitled to infer from the associations and the activities of the individual defendants participation in the unlawful agreement charged in violation of the specific statute. As to each defendant,[14] the jury might well have found a sufficiency of evidence of association and concerted action to convince them of guilt to a moral certainty by evidence which was inconsistent with every other reasonable hypothesis.
 
 
 74
 Therefore, it is the function of this Court to review the evidence in this case to determine whether the rulings of the trial court on the motions for directed verdict were correct.
 
 
 75
 We hold there was evidence from which the jury might have concluded beyond a reasonable doubt:
 
 
 76
 (a) That two or more persons named as conspirators, after June 28, 1940, had entered into a combination and conspiracy as charged in the indictment;
 
 
 77
 (b) That each defendant herein, knowing of the unlawful design, became a party thereto and entered into the combination and acted in concert with the others charged as conspirators;
 
 
 78
 (c) That after the formation of this conspiracy at least one overt act charged in the indictment to effect the object of the conspiracy and in furtherance of the objects thereof was performed by a defendant within three years prior to the filing of the indictment;
 
 
 79
 (d) That each defendant, in joining this concert of action and in any act done in furtherance thereof, had the specific intent to overthrow and destroy the government of the United States by force and violence as speedily as circumstances would permit.
 
 
 80
 Technically then, we find the trial impeccable from the standpoint of fairness and from the standpoint of adherence to principles theretofore laid down. It remains to consider some extraneous incidents. Appellants moved to postpone the trial because of the publication of a serialized article in a local paper with the usual lurid announcements that revelations would be made as to 'how the Communists intend to overthrow the U.S. Government and when' with a great deal more of similar import. The fact that the writer had been a witness in the trial of the New York defendants named here as co-conspirators was dwelt upon. The series opened January 20 and ended February 7, 1952. The trial opened and the jury was drawn on February 1. The defendants had opportunity for examination of members of the jury as to prejudice, bias and formation and expression of opinion. This is sufficient safeguard. No trial could ever be held during time of war such as this was, if public discussion of vital national issues was the basis for postponement. The defendants had ample protection against an inclusion of a juror affected by such a newspaper discussion by the voir dire and the use of peremptory challenge. If the trial could have been postponed for sixty days for that reason, the defendants could never have been tried until Communism would have become a dead issue, no longer the subject of newspaper discussion. There was here no abuse of discretion.
 
 
 81
 There was a motion for mistrial based upon the affidavit of one of defendants, in which the following facts were set up: on June 25, 1952, J. Edgar Hoover, Director of the Federal Bureau of Investigation, at the request of Senator McCarran, Chairman of the Senate Internal Security Subcommittee, forwarded to the latter a monograph prepared by this organization. This document dealt with the advocacy of the Communist Party of violent overthrow of the government, and contained considerable documentation from the so-called Marxist-Leninist classics. The monograph was released to the press in Washington by Senator McCarran on July 29, 1952. That day and thereafter, just as counsel for the defense had completed his first argument, the release commenced to receive widespread coverage in Los Angeles by all leading newspapers, radio and television, and through such media excerpts from the monograph were broadcast to the public. When the matter was called to the attention of the trial court by motion for mistrial, various suggestions were made as to how the matter might be handled to discover whether the jurors had disobeyed the continuous instructions of the court of confine their attention to the evidence. The defendants were clearly fencing. The trial court decided to trust the jury. This reliance upon members of that body to act as judges is in accordance with our finest traditions.
 
 
 82
 The trial court said: 'It is regrettable that the report was released for publication at an unfortunate time from the standpoint of all concerned with this trial.' Unquestionably, the matter was of immense public interest and was within the public domain. The media of publication had a right to publish. It has been pointed out that the government of a republic cannot operate without the pitiless light of publicity. Great service is performed daily by exposure of maters which, if suppressed, would operate to destroy our security. When the country was at war, as it was on July 1, 1952, publicity was especially necessary over matters of national concern in moral and ideological defense of current aims. Still, it should never be forgotten that, if there is failure to accord to defendants a fair and impartial trial in a criminal case, the foundations are weakened. The powers of the trial court are conferred upon it for that express purpose. The media of publicity have an even greater responsibility than the courts to see that there is a fair trial of politically unpopular defendants. Somehow, there is a current belief that publicity is uncontrolled and that the courts are powerless to protect those charged with crime.
 
 
 83
 Ever since this Court has had this matter, there have been positive directions through publicity as to how it should be decided. But judges are products of a hardy climate. We do not palliate the offense, however. Such expressions do positive harm. It tends to make the public believe the courts accept such directions if the prophecy happens to be correct. It is much more true when a verdict of guilty is brought in after a great fanfare of publicity. With the trial court, we believe, to say the least, the incidents were extremely regrettable in the public interest.
 
 
 84
 However, a jury which had heard the evidence contained in this record over a period of six months, who deliberated for six days after the arguments, who had heard constantly reiterated warning not to read anything, not to listen to the radio and not to discuss anything which related to the case, probably tried to carry out their instructions and decide the case on the evidence. The trial judge believed this jury could be trusted. We do not think, simply because they arrived at a verdict of guilty, that his judgment was unsound.
 
 
 85
 Besides, there is a striking anomaly in the position of defendants. They claim the right to teach, advocate and assemble in the cause of sedition without interference so long as they take no action. They claim the right to advocate the duty and necessity of the overthrow so long as they do so sotto voce. They claim the right to hold publicity meetings in honor of the political saint of a sinister foreign power and demand the acquittal of their fellow conspirators then on trial. Yet they protest the right of a United States senator to give out a release on a subject vital to the security of this country in time of war. Apparently the Bill. of Rights is double-edged.
 
 
 86
 Even if the jurors or some of them heard or read some part of this public discussion-- a fact not proved-- this Court is of opinion the verdict was founded on the evidence. The trial court properly refused to invade the secrecy of the petit jury room in order to discover material to cavil at the determination.
 
 
 87
 In conclusion, in the Dennis case the court was dealing with the substantive crime denounced by the single statute.
 
 
 88
 'The first paragraph of the quoted instructions calls for the jury to find the facts essential to establish the substantive crime, violation of §§ 2(a)(1) and 2(a)(3) of the Smith Act, involved in the conspiracy charge.'
 
 
 89
 This statute has now been amended and the present indictment is much broader and bottomed essentially on a different enactment. There, in construing the specific act, the main opinion suggests:
 
 
 90
 'The question in this case is whether the statute which the legislature has enacted may be constitutionally applied. In other words, the Court must examine judicially the application of the statute to the particular situation, to ascertain if the Constitution prohibits the conviction.'
 
 
 91
 While the Supreme Court professedly did not review the evidence of the trial, there is indication that, if it had not been deemed sufficient, the conviction of the co-conspirators would have been set aside. The main opinion states:
 
 
 92
 'Where there is doubt as to the intent of the defendants, the nature of their activities, or their power to bring about the evil, this Court will review the convictions with the scrupulous care demanded by our Constitution. But we are not convinced that because there may be borderline cases at some time in the future, these convictions should be reversed because of the argument that these petitioners could not know that their activities were constitutionally proscribed by the statute.'
 
 
 93
 It may be that prospects of larger policy or changes in the look of international affairs should be viewed to fix the acts proven here in perspective. But, as we understand it, as a lower federal court that is not our function. At the time this case was tried, there was a background of war. The law which was passed in 1940 was passed to meet emergencies created by war although not especially to meet the threat involved in this case. That enactment has been denounced as the first peacetime sedition law since 1798, although anyone who believes the country was not at war in 1940 does not squarely face the facts of life.[15] If the founders were advised that statute was necessary to meet the threat of the excesses of the French Jacobins then tending toward world-wide imperialism with a fatalistic zeal and a crusading flair and therefore compatible with the new Constitution, the Act of 1940 was probably advisedly deemed necessary by the Congress to provide for the national defense and protect the national ideals and aspirations.
 
 
 94
 On the other hand, the future of this country is imbedded in the fundamental guaranties. The right to speak freely, even though tremendous majorities disagree, is fundamental. The power to assemble peaceably to present grievances is a foundation of liberty. The right to publish expressions and give them distribution despite official disapproval must be retained. The jury found defendants guilty beyond a reasonable doubt of conspiracy to commit offenses against the United States of America 'with the intent of causing the aforesaid overthrow and destruction of the government by force and violence as speedily as circumstances would permit.' The actions, teaching, publication and freedom of assembly allowed without implication of criminality seem sufficiently to have vindicated the fundamental guaranties. The trial court elaborated upon the rights of defendants as follows:
 
 
 95
 'Under our system of law, guilt of crime is a personal and individual matter. You may not convict any defendant merely by reason of the fact that you may find him or her to have been an officer or member of the Communist Party of the United States, no matter what you may find were the principles and doctrines advocated and taught by that party during the period covered by the indictment. * * * The holding of a belief or opinion does not constitute advocacy or teaching. Hence the Smith Act does not prohibit persons who may believe that the violent overthrow and destruction of the Government of the United States is probable or inevitable from expressing that belief. Whether such belief be reasonable or unreasonable is immaterial. Prediction or prophecy is not advocacy. * * * Any advocacy or teaching which does not include the urging of force and violence as the means of overthrowing and destroying the Government of the United States is not within the issue of the indictment here and can constitute no basis for any finding against the defendants. * * * The kind of advocacy and teaching which is charged and upon which your verdict must be reached is not merely a desirability but a necessity that the Government of the United States be overthrown and destroyed by force and violence and not merely a propriety but a duty to overthrow and destroy the Government of the United States by force and violence. * * * The government referred to is the present Government of the Untied States, which does afford to the people democratic means for bringing about such changes as they desire; not some hypothetical future government which affords no such means. * * * The defendants, in common with all other persons living under our Constitution, have a general right protected by the First Amendment to hold, express, teach and advocate opinions, even though their opinions are rejected by the overwhelming majority of the American people; and have the further right to organize or combine peaceably with other persons for the purpose of spreading and promoting their opinions more effectively. * * * Whether you agree with these opinions or whether they seem to you reasonable, unreasonable, absurd, distasteful or hateful has no bearing whatever on the right of other persons to maintain them and to seek to persuade others of their validity. * * * No inference that any of the defendants knowingly and wilfully conspired as charged in the indictment, or intended to cause or bring about the overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit, may be drawn from the advocacy or teaching of socialism or other economic or political or social doctrines, by reason of any unpopularity of such doctrines or by reason of any opinion you may hold with respect to whether such doctrines, or the opinions or beliefs of any of the defendants, are unreasonable, distasteful, absurd or hateful. * * * The defendants, in common with other persons living under our Constitution, have the right protected by the First Amendment to criticize our system of Government and the Government itself, even though the speaking of writing of such criticism may undermine confidence in the Government or cause or increase discontent. They have the right also to criticize the foreign policy of the United States and the role being played by this country in international affairs; and to praise the foreign policy of other governments and the role being played by those governments in international affairs. * * * The right of the defendants to enjoy such freedom of expression is unaffected by whether or not the opinions spoken or published may seem to you to be crudely intemperate, or to contain falsehoods, or to be designed to embarrass the Government. No inference of conspiracy to advocate and teach the necessity and duty of overthrow and destruction of the Government of the United States by force and violence, or of intent to cause or bring about the overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit, may be drawn from such expressions alone. * * * Therefore, activities such as membership or officership in the Communist Party, or organization of units of the Communist Party, or recruitment of members, or the circulation of books, articles, magazines and newspapers, or the writing of articles and directives, or the conducting of schools and classes, or going 'underground,' or the use of fictitious names, are not to be considered unless you are satisfied beyond a reasonable doubt from all the evidence in the case that any such activities of the defendants or any of them, as you may find, were carried on as means or methods in furtherance of an object or purpose of the conspiracy alleged in the indictment. * * * No statement or writing of any kind purporting to declare the principles or theories of the Communist Party, or on any other topic, may be imputed to the Communist Party merely because made by some member, leader or officer of the party, or a teacher of a party school or class, in the course of party activities. * * * The defendants are not being tried to determine what kind of people they are, or what sort of things they would be likely to do if allowed to remain at liberty. Rather it is your duty to determine whether the evidence establishes beyond a reasonable doubt that they did do in the past the things charged in the indictment. * * * As previously stated, the intent required to convict a defendant is not merely the intentional conspiracy to teach and advocate the necessity and duty of overthrowing and destroying the Government of the United States by force and violence. It must also appear beyond a reasonable doubt from the evidence in the case that such defendant had the further specific intent to cause or bring about the overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit.'
 
 
 96
 Defendants were convicted of something very different from the use of speech, assembly or publication.
 
 
 97
 Affirmed.
 
 
 
 [1]
 A motion for bill of particulars was made and denied, a motion to suppress evidence upon the ground that the methods whereby it was obtained were illegal, a motion to dismiss the indictment on the grounds it was barred by 'res adjudicata,' a motion to order government agents to desist from surveillance during the trial, a motion to investigate alleged hampering of one of defendants prior to trial were made and denied. There were motions to strike from evidence declarations of third parties on various grounds. There were several motions for mistrial, and finally there were motions for arrest of judgment. Other motions of various types were made and denied. The opinion deals specifically with certain of these motions. Generally, the discussion covers the points raised. It would extend the discussion intolerably to cover each in detail. The rulings were not erroneous
 
 
 [2]
 In the District Court, this case was entitled United States v. Foster, 9 F.R.D. 367. The opinion of the Court of Appeals of the Second Circuit Appears as United States v. Dennis, 183 F.2d 201. Throughout the opinion here, that case will be referred to as 'Dennis' in whatever court the particular proceeding may have taken place
 
 
 [3]
 See Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557
 
 
 [4]
 The comparison of the indictments in the Dennis case and the case at bar is graphically set out in United States v. Schneiderman, 102 F.Supp. 87, at pages 97-102
 
 
 [5]
 The Smith Act, in the form in which it appeared upon the books at the time of the trial here and at present, reads as follows:
 'Whoever knowingly or willfully advocates, abets, advises, or teaches the duty, necessity, desirability, or propriety of overthrowing or destroying the government of the United States or the government of any State, Territory, District or Possession thereof, or the government of any political subdivision therein, by force or violence, or by the assassination of any officer of any such government; or
 'Whoever, with intent to cause the overthrow or destruction of any such government, prints, publishes, edits, issues, circulates, sells, distributes, or publicly displays any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence, or attempts to do so; or
 'Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence; or becomes or is a member of, or affiliates with, any such society, group, or assembly of persons, knowing the purposes thereof--
 'Shall be fined not more than $10,000 or imprisoned not more than ten years, or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction.' 18 U.S.C.A. § 2385.
 
 
 [6]
 September 23, 1950, ch. 1024, Title 1, § 4, 64 Stat. 991, 50 U.S.C.A. § 783(f)
 
 
 [7]
 The notes of decisions under this statute cover over 315 pages of United States Code Annotated
 
 
 [8]
 Cf. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489
 
 
 [9]
 The trial court consistently and definitely ruled throughout the trial and the instructions that this was a conspiracy to violate the Smith Act. Although purists might find a difference between conspiring to teach, advocate and organize with intent to bring about speedy overthrow and destruction by force and violence and conspiring 'to overthrow, put down, or to destroy by force the Government of the United States,' proscribed by 18 U.S.C.A. § 2384, the latter statute which was mentioned in the Dennis case, 341 U.S. at pages 581-582, 71 S.Ct. at page 903, might well be applicable to the indictment here. No problem arises in that connection since the trial court clung to the theory that the Smith Act alone was applicable
 
 
 [10]
 In United States v. Flynn, D.C.S.D.N.Y., 106 F.Supp. 966, the instruction was that the statute of limitations had run against the conspiracy so far as organizing was concerned. This may have been well enough as a precaution. Actually, it was prejudicial to defendants since the government was thereby relieved of the necessity of proving that the defendants combined to organize. The instruction on this feature was: 'To find a defendant guilty, therefore, you must find that he conspired to teach, but it is not necessary that you find as well that he conspired to organize the Communist Party.'
 
 
 [11]
 The majority opinion of the Supreme Court without the dissent was introduced, which was highly favorable, but this did not supply the essential foundation required to establish such an affirmative defense
 
 
 [12]
 As the record shows, objection was made to Government's proposed instruction No. 23, which embodied a charge like that given in Dennis (R. 12346-7)
 
 
 [13]
 The attitude of the trial judge to the questions argued here, and many others, is set out in a series of opinions: United States v. Schneiderman, D.C., 102 F.Supp. 87 (dismissing the two original indictments); 104 F.Supp. 405 (in camera inspection of documents); 106 F.Supp. 731, 737 (disclosure of notes of witness); 106 F.Supp. 892 (striking of evidence); 106 F.Supp. 906 (motions for judgment of acquittal, new trial and arrest of judgment), 106 F.Supp. 906, 927-941 (instructions to the jury)
 
 
 [14]
 Each of the separate defendants has filed a brief contending the evidence was insufficient to sustain a conviction as to him. These have been carefully considered in a review of the record. The evidence was sufficient to submit to the jury as to each. Certainly, therefore, as to each the evidence was sufficient to sustain a verdict of guilty. It is unnecessary to set out tabulations of the facts here
 
 
 [15]
 See opinion of December 23, 1940, Stone v. Christensen, D.C., 36 F.Supp. 739, 742: 'The petition of Stone rings changes upon 'peace time' conscription. * * * but whether events prove we are at war, in a state of war, or clinging to an equivocal neutrality, a failure to register manpower of the country would be a failure to provide for 'the common defense'.'